In re Harvey A. JONES, Debtor.

The ENTERPRISE NATIONAL BANK OF ATLANTA, Plaintiff,

v.

Harvey A. JONES, Defendant.

Bankruptcy No. 94–52349.
Adv. No. 95–5010.

United States Bankruptcy Court,
M.D. Georgia,
Macon Division.

May 13, 1996.

952

Wesley J. Boyer, Macon, Georgia, for Debtor.

Mitchell S. Rosen, Atlanta, Georgia, for the Bank.

### MEMORANDUM OPINION

JAMES D. WALKER, Jr., Bankruptcy Judge.

This matter comes before the Court on Complaint to Determine Dischargeability of Debt, filed by the Enterprise National Bank of Atlanta (the "Bank"). This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(I). The Court held a trial on the Bank's Complaint on November 30, 1995. For the following reasons, the Court will deny the Bank's requested relief. These findings of fact and conclusions of law are published pursuant to Fed.R.Bankr.P. 7052.

### FINDINGS OF FACT

Harvey A. Jones ("Debtor") is a practicing surgeon and debtor-in-possession in the

Chapter 11 case [1] underlying this adversary proceeding. Debtor makes a substantial living from his surgical practice, earning approximately $800,000 per year. Debtor has also invested heavily in real estate and other ventures both related and unrelated to his medical practice. These investments have lead to Debtor's financial misfortune and the present adversary proceeding.

In the early 1990's, Debtor and Mr. Elmer Cook agreed to acquire and develop commercial real estate properties. Debtor was to provide the financial backing for the venture, while Mr. Cook was to handle the day to day business operations. The agreement provided that when Debtor had been repaid for his investment, Debtor and Mr. Cook would split the profits on an equal basis.

Mr. Cook has an extensive background in commercial real estate, having been a broker and developer for over twenty-five years. Mr. Cook holds a degree in real estate financing, and is also a general contractor. Debtor holds no such expertise and relied exclusively upon Mr. Cook to manage the investment properties and to handle the necessary financial arrangements. Debtor contacted Mr. Cook several times a day for a three to four year period regarding the status of the commercial real estate investments. Mr. Cook was Debtor's sole source of information.

On May 6, 1993, the Bank made a $126,250 loan to Atlanta Magnetic Imaging, Inc., an MRI diagnostic lab and one of Debtor's and Mr. Cook's investment properties. The stated purpose for this loan was to fund deficiencies in the lab's cash flow during the start up phase. Debtor signed a personal guarantee of this debt and provided the Bank with a personal financial statement. This loan and the related events form the basis of the Bank's complaint.

Prior to entering into the loan with Atlanta Magnetic Imaging, Inc., the Bank's president, Mr. James A. Walker, Jr.,[2] had been contacted by an old high school friend on behalf of Mr. Cook. Mr. Cook later ap-

proached the Bank, and began to make arrangements to obtain the loan with Debtor's personal guarantee. Mr. Cook prepared and submitted Debtor's personal financial statement dated May 20, 1992, in connection with the guarantee. The financial statement was based on information Mr. Cook obtained from Debtor's accountant and bankers. Mr. Cook also provided the Bank with Debtor's tax returns. Debtor knew that Mr. Cook was attempting to arrange financing, but did not know anything specific about the arrangement or the source of the financing.

The financial statement showed that Debtor had a positive net worth of $7,432,950.76. Debtor's 1991 salary was listed as $1,118,600, and the statement showed that Debtor had cash, either solely or jointly owned, in the amount of $600,000.

The Bank had never previously dealt with Debtor. The first time that the Bank and Debtor had any contact was when the Bank sent its representative to Middle Georgia Hospital to obtain Debtor's signature on the financial statement and guarantee. Debtor testified that he glanced over the financial statement prepared by Mr. Cook, and that it looked like it was an accurate reflection of his financial condition as he understood it at the time. Debtor's understanding of his financial condition was based on what he was told by Mr. Cook. The Bank's representative did not ask Debtor any questions regarding the statement.

Prior to sending its representative to obtain Debtor's signature, the Bank's president contacted four other banks in the area, and each made a favorable recommendation regarding Debtor. The four banks confirmed that the cash balances disclosed in the financial statement were correct. The Bank's president also learned that Debtor had paid off a personal guarantee on at least one other occasion. The Bank never sought to confirm the values assigned to various properties on Debtor's financial statement. The financial statement was eleven months old when the loan was made.

---

1. Debtor's Chapter 11 case was filed on August 25, 1994.

2. The name similarity compels me to specify that Mr. James A. Walker, Jr. was unknown to me before he testified as a witness in this case.

954

The Bank loaned funds to Atlanta Magnetic Imaging Inc., on an unsecured basis. The testimony at the trial was that it was highly unusual for the Bank to make such a large unsecured loan to a first time customer based on an eleven month old financial statement and guarantee. The Bank's witnesses testified that in such circumstances the Bank applies a heightened scrutiny to the borrower as compared to existing customers. Also, the Bank usually requires a more current financial statement. However, in this case the Bank's president was reassured by the favorable reports concerning Debtor from his high school friend and the other bankers he contacted.

The May 6, 1993, loan went into default, and Atlanta Magnetic Imaging went out of business without ever really getting its business off the ground. Debtor's brother approached the Bank on Debtor's behalf, seeking a loan to pay off the guarantee liability and assume the liability directly. This second note was entered into by Debtor and Unionville Clinic, Inc., a corporation in which Debtor is a principal. The Bank obtained another financial statement from Debtor, this one dated July 14, 1993.

The July 14, 1993, statement showed Debtor's net worth as $9,192,061. Debtor's income was listed as $1,234,142, and Debtor had cash reserves of $800,000 either individually or jointly owned. Debtor attached banking references, balances and a schedule of real estate assets. The Bank also obtained Debtor's recent tax returns at the same time. This financial statement, like the initial statement, was prepared by Mr. Cook. The information contained in both the statements was not obtained from Debtor personally.

The tax return and financial statement were facially inconsistent with one another. The tax return disclosed an income of $800,000, while the financial statement reported an income of $1,234,142. At this time, Debtor also informed the Bank of equipment lease liabilities totalling approximately $1,000,000 which were not listed on the financial statement. Additionally, the financial statement did not disclose the Bank's claim. There were other similar irregularities on the financial statement. The Bank did not make any

further inquiry regarding the financial statement before approving the replacement loan for Debtor.

Debtor used the proceeds from this replacement loan to pay off the May 6, 1993, loan in full. The replacement loan is evidenced by a promissory note dated November 30, 1993, in the amount of $126,500. This note provided for a balloon payment six months later on June 1, 1994. The replacement loan thereafter went into default. The Bank advised Debtor of this default in a letter dated January 13, 1994. The Bank has sought and obtained a default judgment against the Unionville Clinic, as co-maker of the replacement note.

In late 1993, Debtor began receiving notices of pending lawsuits involving his investments. In early 1994, Debtor discovered that many creditors, including banks, vendors, subcontractors and suppliers were not being paid. Mr. Cook had also failed to pay taxes on the commercial properties. A number of properties were not performing as Debtor had expected, with tenant problems and lack of care diminishing the value of the income stream from the real estate.

From late 1993 to August of 1994, Debtor's financial situation declined rapidly. Several of Debtor's properties went into foreclosure, and he depleted his cash reserves paying off certain creditors. Debtor contended in his trial testimony that his bankruptcy had a negative impact on the financial worth of his holdings.

There is a large discrepancy between Debtor's reported worth on the various financial statements provided to the Bank, and the net worth Debtor reported on his bankruptcy schedules. There is a particularly large difference in the values assigned to the real estate properties. The Bank offered no valuation evidence during the trial beyond the financial statements and bankruptcy schedules.

### CONCLUSIONS OF LAW

■ This proceeding is similar to an action under 11 U.S.C. § 727(a)(5), which denies a debtor a discharge if the debtor cannot document a loss of assets. The Bank's position in

this adversary proceeding is that the difference between the assets listed on the financial statements and those on the bankruptcy schedules reveals that Debtor provided a false financial statement in connection with the May 6, 1993, and November 30, 1993, loans. This, the Bank urges, renders the debt nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B). However, the loss of assets is only relevant in this adversary proceeding to the extent that it makes the intentional and material falsehood of the financial statements more or less probable. Thus, the focus of this action is not on the loss of the assets, but rather on the alleged falsity of the financial statements.

A debtor who obtains financing through the use of a false financial statement may find that the debt is nondischargeable in bankruptcy pursuant to section 523(a)(2)(B) of the Bankruptcy Code, which provides:

> (a) A discharge under section 727, 1141, 1228(a) 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
> >
> > > (B) use of a statement in writing—
> > >
> > > > (i) that is materially false;
> > > >
> > > > (ii) respecting the debtor's or an insider's financial condition;
> > > >
> > > > (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> > > >
> > > > (iv) that the debtor caused to be made or published with intent to deceive;
> > > >
> > > > ...

11 U.S.C. § 523(a)(2)(B) (Law.Co-op.1996).

■■ The Eleventh Circuit Court of Appeals addressed the correct application of section 523(a)(2)(B) in the case of *Equitable Bank v. Miller (In re Miller),* 39 F.3d 301 (11th Cir.1994) as follows:

> [A] debt is non-dischargeable in bankruptcy where it was obtained by a writing: (1) that is materially false; (2) respecting the debtor's or an insider's financial condition; (3) on which the creditor to whom the debt is liable for such money, property, services,

or credit reasonably relied; and (4) that the debtor caused to be made or published with the intent to deceive. The objecting creditor has the burden of proving each of these elements by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). If any one of these elements is not met, the debt is dischargeable. Moreover, courts generally construe the statutory exceptions to discharge in bankruptcy "liberally in favor of the debtor," and recognize that " '[t]he reasons for denying a discharge ... must be real and substantial, not merely technical and conjectural.' " [citations omitted]. This narrow construction ensures that the "honest but unfortunate debtor" is afforded a fresh start. [citations omitted].

*Id.* at 304.

In the case before the Court, no party contests that the financial statements at issue were respecting Debtor's financial condition. However, the remaining elements of section 523(a)(2)(B) nondischargeability are in dispute. The first consideration is whether the statement was in fact materially false when it was created. The Bank conceded at trial that the alleged falsehoods relate solely to the valuation of the real property listed in the financial statements. Accordingly, the Court will focus on those alleged discrepancies.

■ Material falsity contains two elements: 1) a falsehood 2) that is significant in both amount and effect on the creditor receiving the financial statement.

> "Materiality," ... for purposes of § 523(a)(2)(B) requires more than merely examining the truth of the information provided. A second step is required. The information must not only be substantially inaccurate, but also must be information which affected the creditor's decisionmaking process.... The information must have actual usefulness to the creditor and must have been an influence on the extension of credit. Although there is substantial similarity between such analysis of "materiality" and the element of "reasonable reliance" ... analysis of the creditor's

use of the requested information is appropriate in both contexts. [citations omitted].

*Heinold Commodities & Securities, Inc. v. Hunt (In re Hunt),* 30 B.R. 425, 440 (M.D.Tenn.1983).

■ Debtor testified at trial that he was largely ignorant of the financial condition of his investments. The real estate properties we're managed by Mr. Cook. Debtor said believed that Mr. Cook had been concealing the true financial worth and status of the properties. Debtor testified that "in retrospect," the valuations assigned to the properties on the financial statements were probably false. Debtor identified no particular piece of property as being falsely valued, and his statement rested entirely upon his belief that he had been deceived by Mr. Cook. This statement, the Bank contends, constitutes a judicial admission such that the Bank need show no evidence of either falsity of the financial statement or materiality of the falsehood.

[A] judicial admission is a "formal act, done in the course of judicial proceedings, which waives or dispenses with the production of evidence, by conceding for purposes of litigation that the proposition of fact alleged by the opponent is true." [citation omitted]. Judicial admissions are conclusively binding on the party asserting them. [citations omitted]. Formal acts such as a party's in-court testimony or pleadings can be delineated as judicial admissions. However, only "deliberate, clear and unequivocal" formal acts can be found to constitute judicial admissions. [citations omitted].

*Weyerhaeuser Co. and Subsidiaries v. United States,* 32 Fed.Cl. 80, 118 (Cl.Ct.1994).

■ Despite the fact that the value of the real property is the crux of the Bank's contentions, the Bank offered no independent valuation evidence from which to contrast those contained in the financial statements. The Bank's entire case rests on the argument that the difference in value between the financial statements and the bankruptcy schedules is so great that the financial statements must have been false when they were created. This is a logical leap that is justified in only the most extreme cases, such as where there is no other credible explanation for the decline in value of assets. The Bank contends that Debtor made a "judicial admission" at trial, and that as a result the Bank need not provide any other evidence of material falsity.

■ Judicial admissions typically take the form of "factual assertions in pleadings, stipulations, statements in pretrial orders, and by response to requests to admit." *Oak Mill Enterprises 2000, Inc. v. Knopfler (In re Schraiber),* 141 B.R. 1000, 1006 (Bankr. N.D.Ill.1992) (citing cases). "Some degree of formality is entailed. . . . Judicial admissions are usually made by counsel." *In re Applin,* 108 B.R. 253, 258 (Bankr.E.D.Cal.1989) (*citing* 9 J. Wigmore, EVIDENCE §§ 2588–94 (Chadbourne rev. 1961)). However, "Judicial admissions . . . are not limited to statements made in the particular motion or application pending. Any 'deliberate, clear and unequivocal' statement, either written or oral, made in the course of judicial proceedings qualifies as a judicial admission." *Gowan v. Lefkas General Partners (In re Lefkas General Partners),* 153 B.R. 804, 807 (N.D.Ill.1993) (citing cases). Judicial admissions,

serve a highly useful purpose in dispensing with proof of formal matters and of facts about which there is no real dispute. Once made, the subject matter ought not to be reopened in the absence of a showing of exceptional circumstances, but a court, unquestionably, has the right to relieve a party of his judicial admission if it appears that the admitted fact is clearly untrue and that the party was laboring under a mistake when he made the admission.

*New Amsterdam Casualty Co. v. Waller,* 323 F.2d 20, 24 (4th Cir.1963).

■ Due to the limiting effect judicial admissions have upon evidentiary presentations, "When a party testifying at trial or during a deposition admits a fact which is adverse to his claim or defense, it is generally preferable to treat that testimony as solely an evidentiary admission." *Keller v. United States,* 58 F.3d 1194, 1199 n. 8 (7th Cir.1995). Consistent with the nature of the Court's role regarding judicial admissions as set forth in the *New Amsterdam* case, "[o]nce it is deter-

mined that a statement is a judicial admission it is within the court's discretion whether to accept or reject it." *Schraiber,* 141 B.R. at 1006.

This "admission" the Bank relies upon lacks the formal, deliberate, clear and unequivocal waiver of proof associated with a judicial admission. *United States v. Belculfine,* 527 F.2d 941, 944 (1st Cir.1975) ("Because of their binding consequences, judicial admissions generally arise only from deliberate voluntary waivers that expressly concede for the purposes of trial the truth of an alleged fact.") Counsel for Debtor has consistently argued against the material falsehood alleged by the Bank. Debtor's admission does not stem from an acknowledgment that the Bank's recitation of the facts is correct, but rather from the fact that Debtor believed that Mr. Cook had deceived him and mismanaged the properties. In truth, Debtor did not know when or how Mr. Cook began his deception, and could not identify the point at which the properties began to decline in value. Debtor testified that he had seen several previous appraisals of the properties, and that Mr. Cook's valuations appeared consistent with those appraisals. Debtor contended that the value of the properties declined, at some point, due to Mr. Cook's mismanagement.

The admonition of the Seventh Circuit regarding testimony given at trial is well taken. The statements by Debtor to the effect that the financial statements were false shall be treated solely as an evidentiary admission. *Keller,* 58 F.3d at 1199 n. 8. This is particularly appropriate when the alleged judicial admission is in reality an opinion of value. *In re Cobb,* 56 B.R. 440, 442 n. 3 (Bankr. N.D.Ill.1985) ("the statement of value in the schedules relates to value and is a matter of opinion rather than fact. As such, it probably cannot give rise to a judicial admission".). The Court declines to exercise its discretion in this case and treat Debtor's utterance as a judicial admission.

Nevertheless, the decline in values assigned to Debtor's properties was significant, and may provide evidence of the alleged falsity of the financial statement. Mr. Cook's past alleged mismanagement and misrepresentation of the status of the properties might support an inference that the values assigned to the properties in the financial statements were inflated.

The values assigned to Debtor's real estate on the financial statements totaled $13,435,-000. Over the thirteen month period between the creation of the financial statements and the filing of the bankruptcy petition, the value of Debtor's property appeared to decline to $8,296,537. This is a decrease of 38.2 percent.

The Bank's attempt to demonstrate Debtor's financial condition at a prior date by reference to Debtor's financial condition contained in the bankruptcy schedules has been referred to as the theory of "retrojection." *See Foley v. Briden (In re Arrowhead Gardens, Inc.),* 32 B.R. 296 (Bankr.D.Mass.1983), *aff'd,* 776 F.2d 379 (1st Cir.1985). "Where a debtor is shown to be insolvent at a date later than the date of the questioned transfer, and it is shown that the debtor's financial condition did not change during the interim period, insolvency at the prior time may be inferred from the actual insolvency at the later date." *Id.* at 300 (*citing Hassan v. Middlesex County National Bank,* 333 F.2d 838 (1st Cir.1964); *Braunstein v. Mass. Bank & Trust Co.,* 443 F.2d 1281 (1st Cir. 1971)). While the court in *Foley* addressed insolvency for the purposes of preferential transfers, this rationale has been used in other cases to demonstrate the falsity of a financial statement by reference to a debtor's bankruptcy schedules. *See e.g. First Alabama Bank v. Bagwell (In re Bagwell),* 125 B.R. 306 (Bankr.N.D.Ala.1991); *John Deere Co. v. Myers (In re Myers),* 124 B.R. 735 (Bankr.S.D.Ohio 1991); *Landmark Leasing, Inc. v. Martz (In re Martz),* 88 B.R. 663 (Bankr.E.D.Pa.1988).

In the *Bagwell* case, the court found that a decrease in net worth of 101%, including a decline in real estate values of 54%, a decline in personalty of 81%, and an increase in liabilities of 16% over a six month period gave rise to the inference that the prior financial statement was false. *Id.* at 309. The court found it to be significant that the debtor was purportedly liquidating his real estate during this time period, and yet the

·debtor's liabilities increased without explanation. *Id.* at 309.

The *Bagwell* court was also concerned with the debtor's "callow youth" defense for the exaggerations on the financial statement in light of the debtor's extensive real estate and bank loan experience. *Id.* at 309. Ultimately, the Court found that the overall decline in the debtor's financial condition was less likely to be attributable to a decline in real estate values than the falsity of the financial statement. *Id.* at 309. The debtor had failed to show sufficient evidence to overcome "the picture which the bank painted of his fraud in obtaining the loan." *Id.* at 309.[3]

In the *Myers* case, the court noted that the "differences between the itemized values set forth in the financial statement and bankruptcy schedules are extreme." *Id.* at 739. In that case, the debtor's net worth declined $2,400,000 over the course of nine days according to the financial statement as compared to the bankruptcy schedules. The debtor conceded "that no such decline occurred." *Id.* at 739. Instead, he said that the difference in values was due to an intervening appraisal and the use of market values on the financial statements as opposed to liquidation values on the bankruptcy schedules. *Id.* at 739.

The *Myers* court found this explanation incredible. The court had independent evidence that the stocks listed in the financial statement were vastly overvalued, the debtor's valuation of the livestock and real estate was based on no relevant fact or opinion, and the values assigned to the debtor's remaining assets were equally flawed. *Id.* at 740. The debtor knew that he was in financial difficulty, and was contemplating filing for bankruptcy protection at the same time he was filling out the financial statement. *Id.* at 739.

The extremely short period between the creation of the financial statement and the bankruptcy petition, coupled with the independent evidence regarding the debtor's false valuations and fraudulent intentions, lead the court to find that the debt was nondischargeable.

From these two cases, this Court is able to distill the relevant considerations in ruling on the Bank's complaint. The Court must consider the time period between the financial statements and the bankruptcy schedules, the amount of the difference between the financial statement and the bankruptcy schedules and any intervening events which may have attributed to the decline in value. The shorter the time period, and the larger the discrepancy in disclosed assets, the more likely it is that the financial statement was false. Due to the tenuous nature of this argument,[4] a debtor's explanations for declining value and conduct as to the creditor in question are relevant. Independent evidence of falsity may be necessary to support the creditor's argument. The creditor's burden is to prove that it is more likely than not that the difference between the financial statement and the bankruptcy schedules is the result of the falsity of the financial statement. *Myers,* 124 B.R. at 740.

The *Martz* case, cited above, is directly on point and contains virtually identical facts to those before this Court. In *Martz,* a lessor of restaurant equipment brought suit against the debtors[5] for the debts of a corporation owning and operating a chain of restaurants. Before the events which lead to the lawsuit, the debtors had been minority shareholders and had little to do with the corporation's financial matters. The majority shareholder of the corporation handled such matters.

3. The court appeared to view the burden of proof as having shifted from the creditor to the debtor at some undisclosed point. Apparently, the court determined that the creditor had made its case by a preponderance of the evidence, and looked to the debtor to explain or otherwise rebut the creditor's case.

4. This is a "facial argument." The facts look bad on their face, but may be explained. If the debtor's explanation for the decline in assets is unopposed by any other evidence other than the fact of the decline, the creditor has failed to carry its burden and the ominous appearance of fraud is dispelled.

5. The suit sought a nondischargeability determination against both Raymond and Kazuko Martz. Raymond was a shareholder, while Kazuko held an office in the corporation. The court later determined that Kazuko Martz exercised no authority in the corporation and knew nothing of its financial dealings. Thus, the focus of the proceedings was upon Raymond Martz's actions.

The majority shareholder had experienced financial difficulties when numerous creditors simultaneously demanded payment. They had sold several properties in order to make payments on these demands. Raymond Martz then purchased all of the stock from the majority shareholder in order to retain several profitable stores. However, Mr. Martz underestimated both the corporation's remaining liability to the Internal Revenue Service, and the IRS's ability to proceed against the remaining restaurants for the corporation's unpaid taxes. Eventually, the IRS's collection efforts resulted in the failure of the remaining restaurants.

In response to the IRS's collection efforts, Mr. Martz sought financing for one of the restaurants, Cafe Raymon, from a bank. The bank and the plaintiff equipment lessor "devised an arrangement whereby the Plaintiff would purchase certain equipment in and for the restaurant, pay the restaurant for equipment already there; purchase new equipment; and lease the equipment back to Cafe Raymon." *Id.* at 665. The bank provided the lessor with leasing documents denominating Cafe Raymon as lessee-borrower, and the debtors as guarantors of Cafe Raymon. In connection with the leasing arrangement, the debtors provided their tax returns, a balance sheet and proforma for Cafe Raymon, three credit references and Raymond Martz's personal financial statement.[6]

The plaintiff lessor and the debtors never directly discussed the debtors' financial condition. The bank which had arranged the transaction also provided the information on Mr. Martz's financial statement. Mr. Martz signed the statement without reviewing it because he trusted the bank to handle the paperwork based on previous business dealings. Mrs. Martz did not review the financial statement. The loan agreement was thereafter consummated.

The plaintiff never verified any of the information contained in the financial statement. The plaintiff's representatives testified that they relied heavily upon Mr.

Martz's strong personal financial statement and credit history in entering into the lease. Significantly, the plaintiff did not investigate the title or the values assigned to certain real estate because the real estate was not pledged as collateral for the loan.

The financial statement was not accurate. Mr. Martz testified that in his opinion the values assigned to his properties were correct. The problem was that numerous parcels of real estate turned out to be encumbered by liens drastically reducing the available equity shown on the financial statement.

In the *Martz* case, the debtors's corporation filed for bankruptcy protection after entering into the first leasing arrangement. Mr. Martz did not inform the plaintiff of this filing. Thereafter, the bank approached the plaintiff regarding a second leasing agreement which was in all respects similar to the first. The plaintiff did not require a new financial statement from Mr. Martz, and only required that the payments on the first agreement be current. In connection with the second leasing agreement, the plaintiff requested tax forms from the debtors, but accepted estimates when the forms were not available. The plaintiff also ran a lien search on Mr. Martz personally which revealed several undisclosed U.C.C. filings. The plaintiff entered into the second agreement without further inquiry.

Thereafter, the debtors declared personal bankruptcy. The plaintiff looked to the debtors' bankruptcy schedules which contained numerous debts not disclosed in the financial statement. Based on this discrepancy, the plaintiff brought a nondischargeability proceeding against the debtors under 11 U.S.C. § 523(a)(2)(B). The court found the debt to be dischargeable.

■ The *Martz* court found first that the debtors could not disclaim the financial statement based on the fact that the bank had in fact provided the information contained in the statement. *Id.* at 671. This Court agrees that, where a debtor adopts the con-

---

**6.** It is unclear from the opinion whether the financial statement documented the finances of both Mr. and Mrs. Martz, or rather whether it pertained solely to Mr. Martz. However, the opinion is clear that Mrs. Martz had little or no input into the financial aspects of the restaurant.

tents of a financial statement, the debtor has "published" the statement within the meaning of section 523(a)(2)(B). The fact that another person filled out the statement will not insulate a debtor from liability. *Id.* at 671. Thus, in this case, the fact that Mr. Cook filled out the financial statement will not protect Debtor in this action.

The *Martz* court next reviewed the financial statement for material falsehood. The plaintiff relied upon the differences between the financial statement and the bankruptcy schedules to find material falsehood. The court found that without any independent valuations to contest those provided by the debtors, the plaintiff had failed to prove that the statements were false. *Id.* at 671. The time period between the creation of the financial statement and the bankruptcy petition, fourteen months, was too remote to support the inference that the financial statement was false. *Id.* at 672. The debtors provided evidence that a substantial amount of their debts stemmed from contingent liabilities, and a large number of personal assets were sold off to make payments on the corporation's debt. *Id.* at 672. In light of these facts, the court declined to infer material falsity in the financial statement. *Id.* at 672.

In this case, the Bank has not provided any independent valuations to contest those contained in the financial statements or to support those contained in Debtor's schedules. The time period between the latest financial statement and the bankruptcy petition was thirteen months, much closer to the facts of the *Martz* case than those of the *Myers* or *Bagwell* cases, cited above. Debtor testified that many of his personal assets listed in the financial statement were depleted in paying off creditors. In many respects, this case is strikingly similar to the *Martz* case. This Court similarly declines to infer material falsity solely from the difference between the financial statement and the bankruptcy petition.

This Debtor's explanation for the decline in value of his real estate holdings is based upon several factors: 1) the fact that Debtor was deceived regarding the condition and profitability of his investments; 2) neglect; 3) tax debt; 4) foreclosures; and 5) the impact of the bankruptcy petition on the value of the real estate. Debtor testified that the values assigned to the real estate on the financial statements were consistent with previous appraisals.

Debtor said the value of the properties began to decline in late 1993 and early 1994. The financial statements at issue in this case were created on May 20, 1992, and July 14, 1993. Both statements were issued prior to the earliest point in which the Court has evidence that the values assigned to the real estate on the statements were no longer accurate. Thus, the Court has no independent evidence of falsehood as of the time the statements were created with which to back up the inference of falsehood urged by the Bank.

Moreover, even if the Court were to find that it is likely that the statements were false when they were issued, the Court has insufficient evidence of materiality. Given Debtor's uncontroverted testimony regarding declining property values from late 1993 until the bankruptcy filing, the Court is unable to assign any reasonable range to the dollar amount of Debtor's alleged falsehood. Materiality is determined in part by the size of the discrepancy. *See e.g. Insurance Co. of North America v. Cohn (In re Cohn),* 54 F.3d 1108 (3rd Cir.1995).[7] The Court is unable to state with any degree of certainty that the alleged falsehood was sufficient to lead a reasonable lender to extend the financing. *Id.* at 1114. Therefore, the Bank has failed to carry its burden of proof in regard to the issue of materiality of the alleged falsehood.

---

7. The *Cohn* court opined that materiality was a question of law which includes a reliance component. *Cohn* 54 F.3d at 1114. However, the court also stated that a falsehood may be material if the falsehood is large enough to lead a reasonable person to rely upon it even if the creditor in question did not. *Id.* at 1114. The court acknowledged an overlap between the materiality issue and the reliance issue, but reserved the actual reliance requirement for section 523(a)(2)(B)(iii). Thus, materiality appears to be a matter of degree.

The failure of the Bank to prove material falsehood means that section 523(a)(2)(B) is not satisfied and the debt is dischargeable. However, in the interest of providing a complete discussion of the facts, the Court will also address the remaining issues relevant to nondischargeability under section 523(a)(2)(B) as to whether the Bank reasonably relied upon the financial statement and whether Debtor caused the financial statement to be published with the intent to deceive.

Reasonable reliance determinations are made on a case by case basis. *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 962 (Bankr.N.D.Ill.1995). This involves determining that the creditor actually relied on the financial statement, and that the reliance was reasonable in light of the facts of the case. The Court's inquiry acknowledges a balancing between the notion that "the Court is not to 'second guess a creditor's decision to make a loan [or extend other credit] or to set loan policy for the creditor,'" and the fact that " 'the requirement of "reasonable" reliance added to § 523(a)(2)(B)(iii) by the 1978 Code surely does not mean that a creditor may "assume the position of an ostrich with its head in the sand and ignore facts which were readily available to it." ' " *Id.* at 963 [citation omitted].

> In other words, under certain circumstances, a creditor has a duty to verify the assets and their values as set forth on a debtor's financial statement. For example, where the creditor is aware of the debtor's reputation for untruthfulness or propensity to deceive, the creditor would have a duty to investigate. [citation omitted]. Under those circumstances, any reliance on the debtor's financial statement would be unreasonable absent an independent investigation. [citation omitted]. In addition, "a creditor's failure to follow its own established lending [or credit] procedures can preclude reasonable reliance on the debtor's financial information." [citation omitted]. "To hold that a creditor is obligated to verify information contained in a financial statement is simply to say that under the circumstances of the particular case,

ordinary prudence would require verification." [citations omitted].

*Id.* at 963.

The evidence presented in this proceeding supports a finding that the Bank relied at least in part upon the financial statement. The Bank's witness, Mr. Walker, testified that the Bank requires a financial statement, particularly when dealing with unsecured loans. The Bank requires that the financial statements be not more than one year old, and that they be renewed on an annual basis. The financial statements in question conformed to those requirements.

Mr. Walker testified that the Bank would not have made the loan without the financial statement. This comports with Mr. Walker's testimony that the Bank relied upon Debtor's overall financial picture in extending the loan.

Mr. Walker also relied upon the positive references Debtor received from other banking institutions as well as the initial reference and recommendation Mr. Walker received from his high school friend. Debtor's track record in paying off guarantees also played an important role in the Bank's decision to make the loan. While the Court is left with the impression that these other sources of reassurance played a larger role in the Bank's decision to approve the loan than the actual contents of the financial statement, the Court is convinced that the Bank relied at least in part upon the presence of the financial statements.

The reasonableness of the Bank's reliance upon the financial statement is, however, questionable. This inquiry is fact-driven, depending upon the particular circumstances present in any case. *BancBoston Mortgage Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556 (6th Cir.1992), *cert. denied*, 507 U.S. 916, 113 S.Ct. 1272, 122 L.Ed.2d 667 (1993). The reasonableness of the Bank's reliance upon the financial statement depends upon the age of the financial statement, the degree of inquiry, and any past dealings the Bank may have had with the Debtor which would engender trust in Debt-

or's representations.[8] As the *Ledford* court stated:

Whether a creditor's reliance was reasonable is a factual determination to be made in light of the totality of the circumstances. Among the circumstances that might affect the reasonableness of a creditor's reliance are: (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*Id.* at 1560 [citations omitted].

This was clearly not the case of a close relationship or personal friendship. The Bank had no previous financial dealings with Debtor before the first loan was made, and the Bank's only experience with Debtor before the replacement loan was the first loan, which had defaulted. Moreover, the only contact the Bank maintained with Debtor regarding the contents of the financial statements were through Mr. Cook. A reasonably prudent lender would question the financial statement when the customer is new and the source of the information is through an intermediary. *Martz*, 88 B.R. at 674.

In order to establish reasonable reliance in a transaction between two parties which have had no previous ongoing business relationship and there is information on the statement that would have lead a reasonable person to believe the statement is ambiguous or suspect, a creditor should independently verify the information contained therein.

*Id.* at 674. [citations omitted].

A creditor's duty to investigate is often triggered by what are commonly known as "red flags." There were several in this case. The financial statement was incorrect on its face in that figures reported on the front page did not match those listed on the attachments supposedly verifying the figures. At the loan signing, Debtor disclosed several obligations which were not reported on the financial statement, including one for over $1,000,000 in leasing obligations. One of the omitted obligations on the second financial statement was the liability to the Bank. Moreover, the first loan went into default, and the Bank still did not question the financial statement or ask Debtor for appraisals.

Mr. Walker testified that the Bank never sought appraisals of the property because it was not accepting the property as collateral. This is inconsistent with the position the Bank takes that it relied upon the overall picture of Debtor's finances in extending the loan. The Bank cannot disclaim the importance of the value of the property for the procurement of an unsecured loan and then assert that its reliance upon those valuations should render Debtor's debt nondischargeable.

In this case, the Bank relied upon an eleven month old financial statement which was facially inaccurate to make an unsecured loan to a new customer without questioning Debtor about the property values upon which the Bank now asserts it reasonably relied. The Bank's unsecured position, the overt inaccuracies on the financial statements, the fact that Debtor was a new customer, and the fact that this was an arm's length relationship call for further inquiry on the Bank's part into the financial statement. In the words of the *Bryson* court, "ordinary prudence" required that the Bank verify the information contained in the financial statements. *Id.* at 963. The Bank failed to exercise such prudence, and hence its reliance upon the financial statement was unreasonable.

The final inquiry under section 523(a)(2)(B) is whether Debtor had published the financial statement with the intent to deceive. The Court has already determined that Debtor may not escape the consequences of adopting the financial statement

---

**8.** *See Bryson,* 187 B.R. at 963 (where the debtor and creditor are strangers there is a duty on the creditor's part to verify assets contained in a financial statement).

even though another person filled it out. The crux in this issue is whether Debtor possessed the intent to deceive.

"Whether a debtor in bankruptcy acted with the requisite 'intent to deceive' under § 523(a)(2)(B) is an issue of fact...." *Miller*, 39 F.3d at 304. "A bankruptcy court may look to the totality of the circumstances, including recklessness of a debtor's behavior, to infer whether a debtor submitted a statement with intent to deceive." *Id.* at 305 [citations omitted].

The Court concludes that Debtor did not act with the intent to deceive the Bank. Debtor's sole source of information regarding the status of his investments valued on his financial statement was Mr. Cook. Debtor had dealt with Mr. Cook for a number of years prior to the events in question, and had not had reason to doubt what Mr. Cook said. While it may not be prudent to rely so heavily upon the honesty of another individual to manage and operate one's investments, mere neglect will not trigger nondischargeability. Such a remedy should not apply to the "careless or presumptuous" debtor, but rather should attach to those debtors who act with "dishonest intent." *Id.* at 305.

Debtor did not learn about the deteriorating state of his properties until after the financial statements were presented to the Bank. The values assigned to the real estate on the financial statements were consistent with appraisals Debtor had seen before Debtor learned of the deterioration of his properties. Previously when Debtor learned of inaccuracies, such as the omitted $1,000,-000 debt on the equipment leases, he notified the Bank.

Had Debtor intended to defraud the Bank, there would have been no incentive for him to obtain the November 30, 1993, replacement loan which made him principally liable with the Unionville Clinic for the debt to the Bank. While Debtor remained liable as guarantor, he would have been at least partially shielded from liability by the principal obligor. By assuming a direct liability to the Bank, Debtor sacrificed any rights of contribution or subrogation which he may have had.

Adding the Unionville Clinic, of which Debtor is a principal, as a principal obligor on the substitute note also gave the Bank additional recovery rights over and above the Bank's existing rights under the guarantee. The Bank has in fact exercised those expanded recovery rights. Voluntarily assuming additional liability on a creditor's claim is not the act of one who is attempting to defraud a creditor. Similar evidence of a debtor's lack of intent to defraud was upheld by the Eleventh Circuit Court of Appeals in the *Miller* case. *Id.* at 305 (upholding a finding of no fraudulent intent based in part upon a debtor's expenditure of exempt assets to salvage the business).

In sum, the Bank has failed to demonstrate that the financial statement was materially false, that the Bank reasonably relied upon the statement or that Debtor published the financial statement with the required intent to deceive. Material falsehood may in some cases be inferred from the differences between the financial statement and the bankruptcy schedules when the discrepancies are large, the time period separating the events is short and the differences are unexplained. In this case, the discrepancies were moderate by percentage, the time was large, and the explanation for the differences was uncontroverted by the Bank. The Bank has failed to present sufficient evidence to show the materiality of any falsehood given Debtor's explanations of the decreased values. The Bank's reasonable reliance is precluded by the fact that the financial statement was eleven months old and was facially inaccurate. The Bank made an unsecured loan to a new customer without asking a single question about the property values upon which the Bank now asserts it reasonably relied.

Finally, the facts of this case do not reveal an intent to deceive. Debtor disclosed omitted liabilities when he learned of them and assumed the liability to the Bank directly via refinancing when he was previously obligated only as a guarantor. In the course of refinancing, Debtor obligated a previously insulated corporation on the Bank's claim. Debtor's actions do not betray an intent to defraud. While it may not be prudent to rely upon another person to manage one's

assets, such neglect will not result in nondischargeability of debt unless it is coupled with other proof of intent to defraud.

The Bank's case was built entirely upon the difference between the financial statements and the bankruptcy schedules. Where the appearance is dispelled by Debtor's uncontroverted evidence, the Bank's complaint must fail. It appears that the Bank's failure to substantiate its claims with independent evidence is, ironically, directly traceable to the failure of the Bank to engage in an adequate investigation of Debtor's finances or the value of his assets, then or now.

An order in accordance with this memorandum opinion will be entered on this date.

### ORDER

The Enterprise National Bank of Atlanta filed a Complaint to Determine Dischargeability of Debt of Debtor Harvey A. Jones in this Chapter 11 case. In accordance with the Memorandum Opinion entered this date, it is hereby

ORDERED that the debt of Harvey A. Jones to The Enterprise National Bank of Atlanta is determined to be dischargeable; and it is hereby further

ORDERED that The Enterprise National Bank's prayer for relief is denied.

SO ORDERED.