**In the Matter of Janet Carter GORDON, Debtor.**

**AGRIBANK, FCB, as Assignee of American Express Centurion Bank c/o AgSmart, Plaintiff,**

**v.**

**Janet Carter Gordon, Defendant.**

**Bankruptcy No. 00–52694 RFH.**
**Adversary No. 00–5145.**

United States Bankruptcy Court,
M.D. Georgia,
Macon Division.

June 13, 2001.

John T. McGoldrick, Jr., Michael N. White, Macon, GA, for Plaintiff.

Wesley J. Boyer, Macon, GA, for Defendant.

### *MEMORANDUM OPINION*

ROBERT F. HERSHNER, Jr., Chief Judge.

AGRIBANK, FCB, Plaintiff, filed a Complaint For Determination of Dischargeability of Debt on October 16, 2000. Janet Carter Gordon, Defendant, filed a response on November 9, 2000. A trial was held March 28, 2001. The Court, having considered the evidence presented and the arguments of counsel, now publishes this memorandum opinion.

### *FINDINGS OF FACT*

Defendant and George T. Gordon were married in 1973. Mr. Gordon began farming in 1973. Defendant helped with chores on the farm. The Gordons have farmed the same land since 1973. After several years of marriage, Defendant obtained a college degree and became a full-time teacher. She has continued to help with chores on the farm.

In 1997, Mr. Gordon filed a bankruptcy petition as a "family farmer" under Chapter 12 of the Bankruptcy Code. In 1998, Mr. Gordon needed additional funds to continue farming. Mr. Gordon, on February 25, 1998, was socializing at a farm supply store in Rochelle, Georgia. The store is part of a national chain known as Terra International, Inc. Richard Rhodes was the general manager of the store. Mr. Rhodes told Mr. Gordon about a new financing program for farmers called AgSmart. Mr. Rhodes represented that AgSmart was a simple loan process that operated similar to a credit card account.

Plaintiff is a Farm Credit Bank and is part of the national farm credit system. Plaintiff developed the AgSmart program to provide operating loans to qualified farmers.[1] AgSmart loans do not exceed $100,000. The AgSmart loan process is designed to advise an applicant within a couple of hours whether his or her loan will be approved. Terra International became a "Dealer" in the AgSmart program in December of 1997. Terra International's employees are trained to process loan applications and loan documents.

In their conversation, Mr. Gordon observed to Mr. Rhodes that it would not do any good for him to fill out an application because he was in Chapter 12 bankruptcy. Mr. Rhodes suggested to Mr. Gordon that he could apply for the loan in his wife's name. Defendant was teaching school that day. Mr. Gordon telephoned Defendant and told her about AgSmart. Defendant told her husband to apply for the loan. Defendant authorized her husband to sign her name on the loan application. Defendant understood that her financial information would be reviewed. Defendant testified that she gave no instructions to her husband as to what information to put on the loan application. Defendant testified that she and her husband had been married for twenty-seven years and that she had no reason to suspect that her husband would misstate any information.

Mr. Gordon and Mr. Rhodes completed an AgSmart Operating Loan Application, which was dated February 25, 1998. The applicant is shown as Janet C. Gordon. Mr. Gordon signed Defendant's name on the loan application. All the information on the application, except for Defendant's street address, was handwritten by Mr.

Rhodes. The application provided in relevant part, as follows:

**Section I: Applicant Classification**
(Answer as appropriate.)

Q Agricultural

? Farmer/rancher

Q Part Time

Year began farming *1977*

. . . .

**Section IV: Income/Revenue** (Please complete all blanks in this section.)

Gross Agricultural and/or Business income/revenue *$234,000* (most recent full year)

. . . .

Total Assets *$620,000*

Total Liabilities *$118,000*

**Section V: Loan Specifics**

Total Loan Amount: *$70,000*

| From this Dealer: | Loan Purpose(s) | Amount for Each Purpose |
|---|---|---|
| | Chemicals & Fertilizers | $70,000 |

. . . .

**Collateral:** Crops **Maturity:** Number of months until loan is due ... 12 ....

. . . .

Applicant Signature: *Janet C. Gordon*

Date: *2–25–98*

Plaintiff had no prior business dealings with Defendant. Plaintiff did not contact Defendant to verify any information on the application. Defendant did not see the completed loan application. Defendant did not personally provide any of the information on the application.

Defendant concedes that her gross agricultural income and total assets were misstated. The loan application shows Defendant's gross agricultural income as $234,000. Mr. Gordon testified that he

---

1. AgSmart loans are originated by American Express Centurion Bank. Defendant's AgSmart loans have been assigned to Plaintiff.

The Court, for convenience, will refer only to Plaintiff.

came up with that amount "off the top of his head." Defendant's salary from teaching in 1997 was $26,404. The Gordons' farm, in 1997, had gross income of $75,309 and, after expenses, had a net loss of $16,328.[2]

The loan application shows the value of Defendant's total assets as $620,000. Mr. Gordon testified that he told Mr. Rhodes that the assets included farm equipment that belonged to him and his mother. Mr. Gordon told Mr. Rhodes that Defendant had access to the equipment. Mr. Gordon testified that Mr. Rhodes acted like that did not matter as long as Defendant had good credit. Defendant testified that her assets probably were worth $120,000. Mr. Gordon testified that the amount shown on the loan application for Defendant's liabilities, $118,000, was correct.

The loan application shows that Defendant began farming in 1977. Plaintiff, however, argues that Defendant was not a farmer. Defendant testified that she is a farmer and a full-time teacher. Defendant has helped with chores on the farm since 1973.[3] Mr. Gordon does most of the actual farming. Defendant concedes that certain financial information on her application was misstated. The Court is persuaded that it need not decide whether Defendant was a farmer.

Mr. Gordon and Mr. Rhodes blame each other for the misstatements on Defendant's loan application. Mr. Gordon testified that he was asked questions by Mr. Rhodes who in turn wrote the information on the application. Mr. Gordon concedes that he did not object to any of the information that Mr. Rhodes wrote on the application. The Court, from the testimony and the evidence presented, is persuaded that Mr. Gordon was eager to obtain a loan and that Mr. Rhodes was eager to have the loan approved so that his business could sell farm supplies to the Gordons. The Court is persuaded that the loan application was a joint effort of Mr. Gordon and Mr. Rhodes. The Court is persuaded that Mr. Gordon and Mr. Rhodes share responsibility for the misstatements.

Mr. Rhodes sent by facsimile Defendant's loan application to Plaintiff. Plaintiff notified Mr. Rhodes within about twenty minutes that Defendant's loan was approved.

Plaintiff processed Defendant's loan application using a scorecard system. The system is a computerized method of processing loan applications that does not involve any subjective intervention. Information from the loan application and the applicant's credit report are "plugged into" a scoring model. Loan decisions are based solely on the information on the loan application and on the credit report. The loan application provides fifty-four percent of the score and the credit report provides forty-six percent. Loan applications with a score of 200 or higher are approved. Applications with a score of less than 200 are not approved unless the local dealer guarantees the loan.

Gary Grosdidier is a credit manager for Plaintiff. Mr. Grosdidier testified that Plaintiff, between 1995 and 2000, made 95,000 loans totaling $3.7 billion using the score card system. Mr. Grosdidier testified that only $12 million of those loans have been "charged off." Mr. Grosdidier testified that 99.7 percent of the loans have been successful. Mr. Grosdidier testified

---

**2.** Mr. Gordon was shown as the proprietor of the farm on the Gordons' joint federal income tax return for 1997.

**3.** *See In re LLL Farms,* 111 B.R. 1016, 1019 (Bankr.M.D.Ga.1990) (three sisters were "family farmers" even though majority of their income came from outside jobs).

that about thirty-six percent of all AgSmart loan applications are approved using the scorecard system. Mr. Grosdidier testified that in 1998 forty percent of the loan applications submitted by Terra International, Inc. were approved.

Defendant's loan application received a score of 220. Mr. Grosdidear testified that Defendant's application would have received a score of less than 200 and would not have been approved if Defendant had shown (1) that she had been farming for only one year, (2) no farm income, or (3) total assets of only $214,000.

Some two weeks after Defendant's loan was approved, Plaintiff sent certain loan documents to the farm supply store in Rochelle. Defendant authorized Mr. Gordon to sign her name to a promissory note, security agreement, and UCC–1 financing statement. Defendant gave Plaintiff a security interest in her crops. Plaintiff filed the financing statement on March 31, 1998.

Several months later, Mr. Rhodes advised Mr. Gordon that he would need additional funds to purchase farm supplies. Mr. Rhodes prepared a second AgSmart Operating Loan Application dated June 29, 1998. Mr. Rhodes copied Defendant's financial information from the first loan application. Mr. Gordon testified that Mr. Rhodes did not ask any questions when the second application was prepared. The second application requested $30,000 to purchase chemicals. Defendant authorized Mr. Gordon to sign her name to the application. Mr. Rhodes sent to Plaintiff via facsimile the application. Defendant's application received a score of 200 on Plaintiff's scorecard system. Plaintiff notified Mr. Rhodes within a few minutes that Defendant's loan application was approved.

Plaintiff sent certain loan documents to the farm supply store. Defendant authorized Mr. Gordon to sign her name to a promissory note, security agreement, and financing statement. Defendant again gave Plaintiff a security interest in her crops. Plaintiff recorded the financing statement on July 27, 1998.

Defendant intended to repay the AgSmart loans from the proceeds of her 1998 cotton crop. Defendant's crop failed because of poor weather conditions. Defendant was unable to repay her obligations to Plaintiff. Defendant filed a petition under Chapter 7 of the Bankruptcy Code on July 21, 2000.

### CONCLUSIONS OF LAW

Plaintiff contends that Defendant's obligations are nondischargeable under section 523(a)(2)(B) of the Bankruptcy Code.[4] This section provides as follows:

**§ 523. Exceptions to discharge**

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

. . . .

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; or

11 U.S.C.A. § 523(a)(2)(B) (West 1993).

Plaintiff has the burden of proving all facts essential to support the objec-

4. 11 U.S.C.A. § 523(a)(2)(B) (West 1993).

tion to dischargeability by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■ First, the Court is persuaded that the AgSmart loan application is a statement in writing respecting Defendant's financial condition. Defendant told her husband to apply for the loan. Defendant authorized her husband to sign her name to the loan application. Defendant understood that her financial information would be reviewed.

■ Second, the Court is persuaded that the loan application is materially false. "A statement is materially false for purposes of section 523(a)(2)(B) if it paints a substantially untruthful picture of financial conditions by misrepresenting information of the type that would normally affect the decision to grant credit." 4 *Collier on Bankruptcy* ¶ 523.08[2][b] (15th ed. rev. 2001); *see also Insurance Company of North America v. Cohn (In re Cohn),* 54 F.3d 1108, 1114 (3rd Cir.1995).

■ "Materiality is determined in part by the size of the discrepancy." *Enterprise National Bank of Atlanta v. Jones (In re Jones),* 197 B.R. 949, 960 (Bankr. M.D.Ga.1996) (Walker, J.).

■ The Court is persuaded that Defendant's loan application contained material misrepresentations. The loan application shows Defendant's gross agricultural income as $234,000 and the value of her total assets as $620,000. In 1997, Defendant's salary from teaching was $26,404 and the gross income from the Gordons' farm was $75,309. Thus, Defendant's income was less than one-half the stated amount even if the farm income is included. The value of Defendant's assets was $120,000. Defendant would not have qualified for the AgSmart loan if her true financial condition had been shown on the application.

Third, the Court is persuaded that Plaintiff reasonably relied upon Defendant's financial information in approving her loan application. *Collier on Bankruptcy* states:

The determination of the reasonableness of a creditor's reliance on a debtor's false statement in writing is judged in light of the totality of the circumstances, taking into consideration:

- whether there had been previous business dealings between the debtor and the creditor;

- whether there were any warnings that would have alerted a reasonably prudent person to the debtor's misrepresentations;

- whether minimal investigation would have uncovered the inaccuracies in the debtor's financial statement; and

- the creditor's standard practices in evaluating creditworthiness and the standards or customs of the creditor's industry in evaluating creditworthiness.

4 *Collier on Bankruptcy* ¶ 523.08[2][d] (15th ed. rev.2001). *See also First National Bank of Olathe, Kansas v. Pontow,* 111 F.3d 604, 610 (8th Cir.1997); *Insurance Company of North America v. Cohn (In re Cohn),* 54 F.3d 1108, 1117–18 (3rd Cir.1995); *Coston v. Bank of Malvern (In re Coston),* 991 F.2d 257, 261 (5th Cir. 1993).

■ "Reasonable reliance connotes the use of the standard of [an] ordinary and average person." *City Bank & Trust Co. v. Vann (In re Vann),* 67 F.3d 277, 280 (11th Cir.1995). Reasonable reliance is a factual determination made on a case-by-case basis. A creditor's duty to investigate a financial statement is often triggered by "red flags." *In re Jones,* 197 B.R. at 961–62.

In *Agribank, FCB v. Webb (In re Webb)*,[5] a farmer applied for an AgSmart loan. The creditor[6] processed the loan application using its computerized scoring system. The creditor accepted as true the financial information on the loan application. The farmer defaulted on the loan. The bankruptcy court held that the creditor had reasonably relied upon a materially false financial statement. The bankruptcy court stated, in part:

Agribank reasonably relied upon the information contained in the application because, in approving the loan, it complied with its regular, procedures and obtained what was represented to be current financial information, in writing.

In applying this objective element, *Insurance Company of North America v. Cohn (In re Cohn)*, 54 F.3d 1108, 1117 (3d Cir.1995), the context of the application process and the type of loan may also be examined. This situation is unlike that of a credit card issuer randomly approving credit based solely upon review of credit reports. It is also not similar to the situation in which a complex loan agreement is made based upon lengthy, but clearly incomplete and contradictory financial information, *cf. Guess v. Keim (In re Keim)*, 236 B.R. 400 (8th Cir. BAP 1999). Rather, Agribank was issuing a loan to an individual farmer for the purpose providing credit at a farm supply cooperative. The context is limited, the loan funds essentially restricted to the business use, and the transactions are in the ordinary course of small farming operations. Thus, the Court does not find it unreasonable that the lender, in this particular context, required only basic asset and liability

information, and adhered to its policy of accepting the farmer applicant's statements as true. Agribank demonstrated that it actually and reasonably relied upon the information submitted to it by the debtor.

256 B.R. at 296–97.

Turning to the case at bar, Plaintiff had no previous business dealings with Defendant. Plaintiff did not verify the information on Defendant's loan application. Plaintiff did obtain a credit report on Defendant. Defendant's loan application and credit report were not "stale." Plaintiff's decision to approve Defendant's loan was based solely on the information on Defendant's loan application and credit report. Plaintiff processed Defendant's loan application using a computerized scorecard system that has proven to be extremely successful in predicting the performance of loans. The Court is persuaded that Plaintiff reasonably relied upon Defendant's loan application.

■ Finally, Plaintiff must show that Defendant caused her financial information to be made or published with an intent to deceive. Plaintiff must show that Defendant's financial information "was either knowingly false or made so recklessly as to warrant a finding that [Defendant] acted fraudulently." 4 *Collier on Bankruptcy* ¶ 523.08[2][e][ii] (15th ed. rev.2001).

In *Equitable Bank v. Miller (In re Miller)*,[7] the Eleventh Circuit Court of Appeals stated:

Whether a debtor in bankruptcy acted with the requisite "intent to deceive" under § 523(a)(2)(B) is an issue of fact, and the bankruptcy court's findings as to this issue are reviewed by both the

**5.** 256 B.R. 292 (Bankr.E.D.Ark.2000).

**6.** The Court notes that the creditor in *In re Webb* is the same creditor in the adversary proceeding at bar.

**7.** 39 F.3d 301 (11th Cir.1994).

district and appellate courts under the clearly erroneous standard. *See Matter of Martin,* 963 F.2d 809, 814 (5th Cir. 1992); *In re Liming,* 797 F.2d 895, 897 (10th Cir.1986); *In re Long,* 774 F.2d 875, 877–78 (8th Cir.1985); *see also Birmingham Trust [National Bank v. Case],* 755 F.2d [1474] at 1477 [(11th Cir. 1985)] (applying clearly erroneous standard to bankruptcy court's finding of "reckless disregard of truth" under § 523(a)(2)(A)). "Because a determination concerning fraudulent intent depends largely upon an assessment of the credibility and demeanor of the debtor, deference to the bankruptcy court's factual findings is particularly appropriate." *In re Burgess,* 955 F.2d 134, 137 (1st Cir.1992) (citing *Williamson v. Fireman's Fund Ins. Co.,* 828 F.2d 249, 252 (4th Cir.1987)); *see also Martin,* 963 F.2d at 814; *see generally* Bankruptcy rule 8013.

. . . .

A bankruptcy court may look to the totality of the circumstances, including the recklessness of a debtor's behavior, to infer whether a debtor submitted a statement with intent to deceive. "Reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inferrence [sic] of intent [to deceive]." *In re Albanese,* 96 B.R. 376, 380 (Bankr.M.D.Fla.1989) (citations omitted); *see also Florida Nat'l Bank v. Gordon,* 91 B.R. 135, 138 (Bankr. N.D.Fla.1988); *Brigadier Homes v. Hert,* 81 B.R. 638, 641 (Bankr.N.D.Fla. 1987); *Matter of Archer,* 55 B.R. 174, 179–80 (Bankr.M.D.Ga.1985).

39 F.3d at 304–05.

 "While it may not be prudent to rely so heavily upon the honesty of another

individual to manage and operate one's investments, mere neglect will not trigger nondischargeability. Such a remedy should not apply to the 'careless or presumptuous' debtor, but rather should attach to those debtors who act with 'dishonest intent.' [*In re Miller,* 39 F.3d] at 305." *In re Jones,* 197 B.R. at 963 (Walker, J.).

Plaintiff relies on *Massey–Ferguson Credit Corp. v. Archer (In re Archer).*[8] In that case, a farmer-defendant signed a blank credit application to purchase farm equipment. The defendant did not give any financial information to Mr. Davis, the local farm equipment dealer. Mr. Davis later put false financial information on the defendant's credit application. Mr. Davis then assigned the loan to the creditor. The defendant was unable to repay the loan and filed for bankruptcy relief. This Court held that the defendant's obligation was nondischargeable. This Court stated, in part, as follows:

In this case, Defendant, who had considerable experience in purchasing and financing farm equipment, did not read any of the applications before signing them, and he signed them knowing they were entirely blank. Defendant gave the signed applications to Mr. Davis to fill out, with the knowledge that Plaintiff would rely on the information contained in the applications when determining whether to extend Defendant financing. Defendant gave the applications to Mr. Davis in spite of the fact that he did not remember when, if ever, he had given Mr. Davis information about his financial affairs. Without such information, Defendant had no reasonable grounds to believe that Mr. Davis would accurately and truthfully fill out the applications. Defendant also made no effort to see

---

**8.** 55 B.R. 174 (Bankr.M.D.Ga.1985).

what financial information Mr. Davis provided in the applications. *See David v. Annapolis Banking & Trust Co.*, 209 F.2d 343, 344 (4th Cir.1953). If Defendant had reviewed the applications, Defendant would have discovered the false information. The Court cannot allow Defendant to avoid responsibility for the natural consequences of his reckless conduct on the basis that Mr. Davis, not Defendant, actually supplied the false information. Because of his reckless indifference, Defendant effectively allowed Mr. Davis to provide the false information upon which Plaintiff subsequently relied. The Court, therefore, concludes that Defendant acted with such reckless indifference to and disregard for the accuracy of the information contained in his applications that the Court finds that Defendant had intent to deceive within the meaning of section 523(a)(2)(B). *See Brookline Trust Co. v. Rosenthal (In re Rosenthal)*, 29 B.R. 495, 497 (Bankr. S.D.Fla.1983); *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Kimberly (In re Kimberly)*, 13 B.R. 145, 146, 4 Collier Bankr.Cas.2d 1445, 1446 (Bankr.S.D.Fla. 1981).

55 B.R. at 179–80.

Turning to the case at bar, the Court is not persuaded that Defendant had an intent to deceive as that term is used in section 523(a)(2)(B). Defendant authorized her husband to sign her name on two loan applications. Defendant did not see the completed loan applications. Defendant did not personally provide any of the information on the applications.

Defendant has been married to her husband for twenty-seven years. The Court is persuaded that Defendant reasonably believed that her husband knew her financial condition and that he would truthfully report that information on the loan applications. The Court is not persuaded that Defendant had any reason to question her husband's honesty. The Court can only conclude that Defendant's husband and Mr. Rhodes were the individuals who acted with reckless indifference in filling out the loan applications. The Court finds no basis to impute their conduct to Defendant.

An order in accordance with this memorandum opinion will be entered this date.