In re Thomas Michael
WRIGHT, Debtor.

Citizens Bank of Washington
County, Plaintiff,

v.

Thomas Michael Wright, Defendant.

Bankruptcy No. 01–55623–JDW.
Adversary No. 02–5055–JDW.

United States Bankruptcy Court,
M.D. Georgia,
Macon Division.

March 28, 2003.

O. Hale Almand, Emmett L. Goodman, Jr., Macon, GA, for Plaintiff.

Danny L. Akin, Macon, GA, for Defendant.

## MEMORANDUM OPINION

JAMES D. WALKER, JR., Bankruptcy Judge.

This matter comes before the Court on Citizens Bank of Washington County's Complaint to Determine Dischargeability. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(I). The Court held a trial in this proceeding from January 28 to January 30, 2003. After considering the pleadings, the evidence, and the applicable authorities, the Court finds the debt to Citizens Bank to be nondischargeable and enters the following findings of fact and conclusions of law in conformance with Federal Rule of Bankruptcy Procedure 7052.

### Findings of Fact

Debtor, Thomas Michael Wright, was a shareholder, an officer, and a director of Milestone Mobile Homes, Inc. Milestone entered into a floor-plan financing agreement with Citizens Bank, under which Citizens would finance Milestone's inventory of mobile homes. Citizens took title in the floor-planned homes as collateral and released title when Milestone paid Citizens for the homes. In addition, Debtor and his associate, Mickey Tharpe, both personally guaranteed the note. Between 1997 and 2000, Milestone sold ten homes out of trust. Upon discovering the out-of-trust sales, Citizens demanded payment on the ten homes from Milestone, Debtor, and Tharpe. Debtor filed bankruptcy, and Citizens seeks to have the debt declared nondischargeable under Sections 523(a)(2)(A), (a)(2)(B), and (a)(6) of the Bankruptcy Code.

In 1990, Debtor and Tharpe formed Milestone, a Georgia corporation operating as a retail seller of mobile homes and accompanying land packages. They each owned fifty percent of the company's stock, and both were directors. Debtor served as president of the corporation, and Tharpe served as secretary-treasurer. No other person ever served as an officer or a director of Milestone. Tharpe's duties pri-

marily were managerial and administrative, while Debtor's duties primarily were sales-related. Both Tharpe and Debtor participated in Milestone's bookkeeping, which consisted of little more than writing checks and making deposits. They tracked corporate expenses by making notations on the check stubs. To track sales, Milestone kept a folder on each customer containing documents related to the sale. It also kept an inventory file of all the mobile homes in inventory.

Tharpe and Debtor did not draw salaries from the corporation but were compensated in other ways. For example, Milestone paid the mortgages on both of their houses. In addition, it leased cars for each of them every two years. Debtor and Tharpe also frequently obtained cash from the general operating account and from the Milestone Insurance Agency account[1] by writing checks either to the bank or to "cash." Sometimes they split the money; other times either Debtor or Tharpe received all the money from cashing a check. The Court is unable to determine from the evidence presented exactly how much money Debtor and Tharpe took out of the business and how it was used. However between 1995 and 2000, one or both of them cashed checks totaling $139,884.42.

On October 16, 1992, Milestone entered into a dealer agreement and floor-plan financing note with Citizens.[2] Pursuant to the dealer agreement, Milestone was required to use the money drawn from Citizens for the purchase of homes manufactured by Horton Homes, to guarantee the title and provide an MSO to Citizen for each mobile home, to make monthly interest payments, to allow Citizens to inspect the mobile homes, and to insure the mobile homes. The note outlined the financial details of the agreement, including the amount of credit available, the interest rate, and a requirement that Milestone submit financial statements upon request. The note also contained a security agreement listing all mobile homes as collateral. Both Debtor and Tharpe personally guaranteed the note. Citizens vice president Eddie Moye handled the account. The purpose of the agreement was to allow Milestone to purchase homes from Horton Homes. The payment procedures used by the parties were as follows: Milestone contacted Horton when it needed a mobile home. Horton would then call Citizens and tell the bank whether the home would be kept as stock on Milestone's lot or would be sold to a particular customer. Citizens checked Milestone's available credit and, if sufficient, issued a check to Milestone. Milestone used the money to pay Horton Homes, which would supply the home. Horton would then send the manufacturer's statement of origin ("MSO"), which is required to obtain permanent title, to Citizens. When a customer of Milestone purchased a mobile home, the proceeds were remitted to Citizens, at which point Citizens would release the MSO. For dealer-obtained financing, the financing institution would send the money directly to Citizens; Milestone was responsible for remitting funds to Citizens only when the customer made its own financing arrangements.

Each year, Milestone had to renew the note for the floor-plan financing. Citizens contacted Milestone when it was time to do so. Beginning in 1993, Debtor and Tharpe took financial statements for Milestone, covering the previous year, to Mr. Moye as

---

1. The account was set up to collect commissions for homeowner's insurance policies sold by Milestone.

2. Milestone had a separate note with Citizens secured by the corporation's real estate and offices.

required by Citizens for renewal. William H. Wiles of Wiles Bookkeeping prepared the statements based on information provided to him by Tharpe and Debtor. Tharpe and Debtor looked at Milestone's financial figures from the previous year and tried to come up with reasonable numbers for the current year, but the numbers were, at best, estimates. To prepare the financial statements, Wiles was given a copy of the previous year's financial statement on which Tharpe had handwritten the current year's numbers. Debtor usually took the information to Wiles, and Wiles merely typed up the figures given to him. Each year's financial statement contained the same notice over Wiles' signature: "In my opinion this presents fairly the Profit & Loss Statement & Balance Sheet from the books of Milestone Homes, Inc. . . . ."

Tharpe and Debtor both represented to Citizens that the financial statements were true and correct. However, a comparison of the financial statements to the corresponding year's corporate tax records for 1995 to 1999 shows that the financial statements consistently and substantially overstated Milestone's assets, profit/taxable income, revenue, and equity.

For 1995, the financial statement showed assets of $196,800, while the tax return showed assets of $97,753. The financial statement showed profits/taxable income of $333,814, while the tax return showed $46,022. The financial statement showed revenue of $1,534,422, while the tax return showed $1,426,006. The financial statement showed equity of $184,870, compared to $48,928 on the tax return.

For 1996, the financial statement showed assets of $187,150, while the tax return showed $79,049. The financial statement showed profit/taxable income of $158,689, while the tax return showed $7,792. The financial statement showed revenue of $1,589,146, and the tax return showed the same figure. This is the only instance in which the figures in the financial statement matched those reported to the IRS. The financial statement showed equity of $176,140, while the tax return showed $67,549.

The information for 1997 is incomplete, with no information available as to profit/taxable income or revenue. However, the financial statement showed assets of $486,245, and the beginning balance sheet from the 1998 tax return showed assets of $370,270. The financial statement showed equity of $299,645, while the tax records reflected equity of $176,770.

For 1998, the financial statement showed assets of $499,327, while the tax return showed $443,227. The financial statement showed profit/taxable income of $165,571, compared with $10,883 reported on the tax return. The financial statement showed revenue of $1,422,390, while the tax return showed revenue of $1,378,541. The financial statement showed equity of $318,527, while the tax return showed $257,227.

For 1999, the financial statement showed assets of $513,990, while an Internal Revenue Service Transcript (the actual return was not available) showed $365,071. The financial statement showed profit/taxable income of $88,817, while the tax records showed a loss of $27,814. The financial statement showed revenue of $1,129,615, while the tax records showed $881,510. The financial statement showed revenue of $336,490, while the tax records showed $18,201.

Mr. Moye and Citizens' executive committee considered the financial statements in deciding whether to renew the note. Mr. Moye gave extra importance to the financial statements because they purported to be prepared by Wiles, who was

known and respected in the community. Had Citizens known the numbers were mere estimates, it would not have renewed the note. Mr. Moye was not disturbed by the drops in net profit shown on the statements because Milestone was still showing some profit and there were no similar drops in the net worth. In addition, Milestone always had met its monthly obligations to Citizens and had repaid in full funds loaned on 102 mobile homes. In other words, Milestone was a good customer, according to Mr. Moye, and Citizens did not interrogate good customers. It neither verified the financial statements, nor requested copies of the corporate tax returns.

In addition to submitting financial statements for Milestone, Debtor provided personal financial statements, which he prepared himself. Debtor testified that he knew of no false information given to Citizens on his personal financial statements. His personal financial statement dated January 1, 1996, reports Debtor's salary as $38,000, reports no salary for his wife, reports rental income of $4,000, and reports other income of $35,000. His personal financial statement dated March 1, 1997, reports no salary for Debtor but shows a $55,000 salary for his wife; it also reports $4,000 in rental income and $35,000 as miscellaneous income from corporation. Debtor's personal financial statement dated December 31, 1999, also reports no salary for Debtor, a $55,000 salary for his wife, and $30,000 in miscellaneous income from corporation. Debtor and his wife's joint tax return for 1998 shows wages of $56,828 and taxable refunds of $552 for a gross income of $57,380. This is consistent with the salary reported for his wife on the March 1997 and December 1999 financial statements; but, unlike the personal financial statements, the tax return shows no corporate income for Debtor. Debtor's 1999 joint

tax return shows wages of $60,853, dividends of $2, and taxable refunds of $884, for a gross income of $61,739. Again, the financial statement dated December 1999 is consistent with the wife's salary but inconsistent with respect to income from the corporation.

Citizens provided no evidence of how it may have used Debtor's personal financial statements in deciding whether to renew the floor-plan financing arrangement.

Prior to renewing the floor-plan note in 2001, Citizens discovered the out-of-trust position. Citizens had sent an employee to check inventory on a quarterly basis. The employee doing the majority of checks for the relevant years was Terry Rogers. Mr. Rogers took a list of Citizens' collateral to Milestone each quarter and asked Tharpe to verify that the mobile homes were still on the lot. During each visit, Tharpe told Mr. Rogers that Citizens' list agreed with the Milestone records. Mr. Rogers made no attempt to verify Tharpe's statements. Debtor was not involved in these discussions.

The first two mobile homes were sold out of trust in 1997. In 1998, four more homes were sold out of trust, and three were sold out of trust in 1999. The last home was sold out of trust in 2000. Throughout this time, Mr. Rogers went to Milestone quarterly to check inventory and never discovered the out-of-trust position. Ultimately, bank examiners alerted Citizens to a potential problem in March 2001. The examiners knew that Citizens had floor planned ten mobile homes for Milestone. However, when the examiners drove by the lot, they saw only nine mobile homes. As a result, Citizens sent employee Ron Frazier to check the floor plan.

When Mr. Frazier arrived at the lot to check the inventory, Tharpe asked him to return later that day. In the meantime,

Tharpe and Debtor discussed what to do about the inventory problem. Before Mr. Frazier returned, Debtor pulled the "spec sheets," which provided the specifications for each home, including its serial number, on the ten mobile homes that had been sold out of trust, and Tharpe placed the sheets inside noncorresponding homes, thus creating the impression that the homes sold out of trust were still on the lot. When Mr. Frazier returned, Tharpe accompanied him to check serial numbers on the homes, which Mr. Frazier did by looking at the spec sheets inside the homes. When Mr. Frazier returned to Citizens, he told Mr. Moye he had been uncomfortable with Tharpe's behavior.

As a result, Mr. Moye went to Milestone the following day to inquire further. Mr. Moye asked about checking the serial numbers on the headers or hitches of the homes, rather than those on the spec sheets. Tharpe told Mr. Moye that the manufacturer had stopped placing the serial numbers on the headers because competing dealers were able to drive by and determine how the homes were equipped just by looking at the serial numbers. Mr. Moye asked Citizens' president to contact Horton Homes to ask about the location of serial numbers. Horton Homes indicated that, in contrast to Tharpe's assertions, the serial numbers were located on the headers. With this information in hand, Mr. Moye confronted Tharpe about the whereabouts of Citizens' collateral. At that point, Tharpe said the collateral had been sold out of trust. Upon Mr. Moye's request, Tharpe gave Mr. Moye a list of the customers who had purchased the ten mobile homes. The sales were made between April 8, 1997, and April 13, 2000. The consequences to the purchasers of the out-of-trust homes is the inability to obtain a title to the home because the MSO never was released by Citizens.

For several of the homes, Debtor had minimal to extensive involvement in the sales, but was unaware of any difficulties in obtaining title. These were the homes sold to Shannon Jones on April 8, 1997, Marguerite Buck on September 2, 1997, Larry Baughman on May 19, 1998, John Williams on October 6, 1998, and Jack Hogan on September 9, 1999. Another home was sold to Debtor's grandfather, Talmadge Wright. The sale in that case was completed properly, but the home was placed on the floor plan to finance certain improvements on April 13, 2000. Debtor handled this deal from start to finish but had no conversations about the title.

For the home sold to Amy Caneega on May 4, 1999, it cannot be concluded that Debtor had any involvement in the sale or knowledge of the title problems. Vicky Ivey, a former officer at George D. Warthen Bank, originated the loan to Ms. Caneega, and the bank took title to the home as collateral. Ms. Ivey called Milestone four or five times to inquire about the title, but she could not recall whether she had ever talked to Debtor about the title.

Although he took no part in the sale, Debtor was aware of title problems with the mobile home sold to Tonya Smith on July 16, 1998. Ken Vickers, a former employee of the Bank of Wrightsville, originated a loan to Ms. Smith that was secured by the mobile home. The Bank of Wrightsville never received title, despite the fact that Mr. Vickers made eight to ten calls to Milestone to inquire about the title. Although he primarily spoke with Tharpe, Mr. Vickers spoke to Debtor once and told him the bank was trying to get title. Debtor told Mr. Vickers he was aware of some problems with title, and he would discuss those problems with Tharpe.

When Cheryl Tanner purchased a mobile home from Milestone on October 8, 1998, Debtor assisted the salesperson at

the request of Ms. Tanner. He discussed the title with Ms. Tanner. Initially, Debtor told her Tharpe handled titles. Ms. Tanner tried to speak with Tharpe but was never able to reach him, so she called Debtor several times instead. In her last phone conversation with Debtor, he told Ms. Tanner she did not need a title. Ms. Tanner later went to Debtor's office, and Debtor told her the state had lost the title application, so she would have to reapply.

Marlee Lanthrop, Jr. purchased a home on November 29, 1999, on behalf of Kendall Heights Church of God, which in turn provided the home to its pastor. The church secured its own financing but immediately paid the balance when the pastor took possession of the home. After the balance was paid, Mr. Lanthrop asked for the title. Debtor told Mr. Lanthrop it would take time to get the title. Mr. Lanthrop spoke to Debtor seven or eight times, but still did not have title as of January 2003. Mr. Lanthrop never spoke to Tharpe about the title.

On April 6, 2001, shortly after Mr. Moye confronted Debtor and Tharpe about the out-of-trust sales, Tharpe transferred his interest in Milestone to Debtor, who assumed all the company's debt. Debtor attempted to collateralize the floor-plan loan with other property, but Citizens rejected this offer and demanded payment on the note. Because no payment was made, Citizens foreclosed on real property used as collateral on another note, with the excess proceeds going to pay down the floor-plan debt, bringing the total debt owed to Citizens to $197,213.67, plus accrued interest and attorney fees. The parties stipulated to the confirmation sale and to the legal sufficiency of attorney fee letters sent in conjunction with the sale, satisfying the notice requirements for seeking attorney fees.

Debtor and his wife filed a joint Chapter 13 petition on June 4, 2001. Debtor's case was bifurcated from his wife's and converted to Chapter 7 on December 12, 2001. Citizens filed a Complaint to Determine Dischargeability pursuant to Bankruptcy Code Sections 523(a)(2)(A), (a)(2)(B), (a)(4), and (a)(6). It has since abandoned its (a)(4) claim. Trial was held from January 28 to 30, 2003, at which time the parties presented arguments and evidence to the Court. At the conclusion of the trial, the Court accepted proposed findings of fact and conclusions of law from both parties. Based on all the evidence, the arguments, and the relevant law, the Court will enter an order denying discharge of Citizens Bank's debt.

## Conclusions of Law

Dischargeability of a particular debt is governed by Section 523(a) of the Bankruptcy Code, which provides in relevant part as follows:

A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [or]

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

. . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C.A. §§ 523(a)(2)(A), (a)(2)(B), (a)(6) (West 1993 & Supp.2002).

The burden is on the plaintiff to prove its case by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 287, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). Courts "construe strictly exceptions to discharge in order to give effect to the fresh start policy of the Bankruptcy Code." *Hope v. Walker (In re Walker),* 48 F.3d 1161, 1164–65 (11th Cir.1995). Thus, "the reasons for denying a discharge must be real and substantial, not merely technical and conjectural." *Equitable Bank v. Miller (In re Miller),* 39 F.3d 301, 304 (11th Cir.1994) (citations and internal quotation marks omitted).

### Section 523(a)(2)(A)

█ To succeed on a Section 523(a)(2)(A) claim, Citizens must prove common law fraud, in which Debtor's actions involve "moral turpitude or intentional wrong." *Securities & Exch. Comm'n v. Bilzerian (In re Bilzerian),* 153 F.3d 1278, 1281 (11th Cir.1998); *Schweig v. Hunter (In re Hunter),* 780 F.2d 1577, 1579 (11th Cir.1986) (abrogated with respect to standard of proof by *Grogan,* 498 U.S. at 287, 111 S.Ct. at 659). To do so, it must satisfy the following elements: (1) the debtor knowingly made a false representation with intent to deceive the creditor; (2) the creditor actually relied on the misrepresentation; (3) the creditor's reliance was justified; and (4) the misrepresentation caused a loss to the creditor. *Bilzerian,* 153 F.3d at 1281. In addition, Section 523(a)(2)(A) provides that the fraud must

not relate to "the debtor's or an insider's financial condition." 11 U.S.C.A. § 523(a)(2)(A). An insider includes a "corporation of which the debtor is a director, officer, or person in control." *Id.* § 101(31)(A)(iv) (West 1993).

█ The misrepresentations at issue in this case are the information contained in the financial statements for Milestone and for Debtor, and statements made by Tharpe during inventory checks regarding the presence of Citizens' collateral on the lot. Because the financial statements relate to the financial condition of Debtor and Milestone-an insider of Debtor-they cannot be the basis for the misrepresentation required under this Section. Thus, only the statements by Tharpe regarding Citizens' collateral are in issue.

The Eleventh Circuit Court of Appeals has stated that "when actual fraud has been committed by someone other than the debtor, the issue is whether the debtor may be held liable for the other's fraud so as to render the resulting debt nondischargeable by the debtor." *Hoffend v. Villa (In re Villa),* 261 F.3d 1148, 1151 (11th Cir.2001) (citing *Strang v. Bradner,* 114 U.S. 555, 561, 5 S.Ct. 1038, 1041, 29 L.Ed. 248 (1885)). In *Villa,* the debtor was allegedly vicariously liable for the securities fraud of his employees under the Securities Exchange Act because he met that Act's definition of a "controlling person." *Id.* at 1150. However, the court ruled that liability for another's fraud under securities law does not translate into liability for that fraud under bankruptcy law. *Id.* at 1153. In fact, the court found only one narrow set of circumstances in which a debtor can be vicariously liable for the fraud of another in the context of dischargeability: In *Strang,* the Supreme Court "imputed liability for fraud in bankruptcy based on the common law of *partnership and agency.*" *Id.* at 1152 (empha-

658

sis added). The court refused to expand the rule in *Strang*.[3] *Id.* In doing so, it cited with approval the Fifth Circuit case of *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1296–97 (5th Cir.1995), that "reject[ed] the argument that the fraud of one corporate officer, director, and shareholder should be imputed to another officer, director, and shareholder." 261 F.3d at 1153.

Because the relationship between Debtor and Tharpe is based on their interest in a corporation and not a partnership, Tharpe's statements may not be imputed to Debtor for purposes of the fraud exception to discharge. Even if agency alone were a sufficient basis for imputing fraud liability from one corporate officer, director, or shareholder to another, Citizens has not shown that Tharpe was an agent of Debtor. Thus, the Court concludes that statements made by Tharpe cannot be the basis of a Section 523(a)(2)(A) action against Debtor.

■ While Citizens is unable to establish the first element of fraud, the third element-justifiable reliance-also is troublesome. Justifiable reliance presents a lesser obstacle than reasonable reliance, but as the Supreme Court stated, "[j]ustifiability is not without some limits." *Field v. Mans*, 516 U.S. 59, 71, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995). "[A] person is 'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or

investigation.' " *Id.* (quoting Restatement (Second) of Torts § 541, comment a). Whether his senses should have alerted him to the need to make further examination will depend on the circumstances of the particular plaintiff. *Id.* at 72, 116 S.Ct. at 444.

■ In this case, Citizens entered into the floor-plan financing agreement with the determination that it needed to make at least a minimal inquiry about its collateral on a regular basis. As a result, it sent a representative to make quarterly inspections of inventory. The evidence indicated that the serial numbers on the mobile homes were printed on the headers or hitches in plain view. Citizens' agent failed to make even a cursory glance at the serial numbers, even though he was charged with doing so. Citizens' reliance on Tharpe's statement about the inventory in lieu of an actual inspection of inventory—an inspection that had been instigated by Citizens—is not justifiable.

Because Citizens has failed to prove a false representation by debtor and failed to prove its own justifiable reliance, the Court concludes that it has failed to prove its case under Section 523(a)(2)(A).

### Section 523(a)(2)(B)

■ A dischargeability claim under Section 523(a)(2)(B) requires that the debt in question was obtained based on a written statement. To prevail on its claim Citizens must prove that the writing (1) was materially false; (2) related to the

---

3. Citizens cited *Deodati v. M.M. Winkler & Assoc. (In re M.M. Winkler & Assoc.)*, 239 F.3d 746 (5th Cir.2001), and *Century First Nat'l Bank v. Holwerda (In re Holwerda)*, 29 B.R. 486 (Bankr.M.D.Fla.1983), in support of its position that Debtor could be liable for Tharpe's fraud. However, in *Winkler*, fraud was imputed to the debtor pursuant to partnership law, which is permissible under

*Strang. Id.* at 748–49. *Winkler* does not speak to imputation of fraud in the context of a corporate relationship. In *Holwerda*, a Section 523(a)(2)(B) case, the debtor conceded that he, himself, had prepared a fraudulent financial statement, so there was no issue of vicarious liability for another's fraud. *Id.* at 487.

debtor's or an insider's financial condition; (3) was reasonably relied upon by the creditor; and (4) was published by the debtor with the intent to deceive. *Miller,* 39 F.3d at 304. Debtor does not dispute that by providing Citizens with financing statements for himself and Milestone, he published a written statement respecting his and an insider's financial condition. However, because Citizens has put forth no evidence that it relied on Debtor's personal financial statement, the Court will limit its analysis to the financial statements for Milestone.

 A falsehood is material if it is "significant in both amount and effect on the creditor receiving the financial statement." *Enterprise Nat'l Bank of Atlanta v. Jones (In re Jones),* 197 B.R. 949, 955 (Bankr.M.D.Ga.1996) (Walker, J.). "'The information must have actual usefulness to the creditor and must have been an influence on the extension of credit.'" *Id.* (quoting *Heinold Commodities & Sec., Inc. v. Hunt (In re Hunt),* 30 B.R. 425, 440 (M.D.Tenn.1983)). In this case, the falsehoods on the Milestone financial statements from 1995 to 1999 were significant in amount. A comparison with corporate tax records for the corresponding years showed relatively large discrepancies in assets, profit/taxable income, revenue, and equity. For the year 1995, the discrepancies between the figures reported on the financial statement and the figures reported to the IRS were $99,047 for assets, $287,792 for profit/taxable incomes, $108,416 for revenue, and $135,942 for equity. For 1996, the discrepancies were $108,101 for assets, $150,897 for profit/taxable income, no difference for revenue, and $108,591 for equity. For 1997, the discrepancies were $115,975 for assets and $122,875 for equity; figures for profit/taxable income and revenue were unavailable. For 1998, the discrepancies were $56,100

for assets, $154,688 for profit/taxable income, $43,849 for revenue, and $61,300 for equity. For 1999, the discrepancies were $148,919 for assets, $166,631 for profit/taxable income, $248,105 for revenue, and $318,289 for equity.

Citizens actually considered the false figures in making its decision to renew credit. Mr. Moye not only referred to the financial statements in making a decision, but he gave them extra weight because they purported to be the product of Wiles Bookkeeping, a well-respected bookkeeping service. Had he known the figures were estimates, Mr. Moye would not have approved renewal of the financing arrangement. Debtor was unable to contest this evidence, instead making the unsubstantiated assertion that the financial statements were merely used to fill Citizens' file on Milestone. Thus, the preponderance of evidence shows that the financial statements were materially false.

 Debtor does not dispute that the financial statements relate to the financial condition of Debtor or an insider of Debtor. So the Court will proceed to the next element. To satisfy the third requirement of Section 523(a)(2)(B), Citizens must prove that it reasonably relied on the written statement. The reasonable reliance analysis is done on a case-by-case basis considering the totality of the circumstances. *Agribank, FCB v. Gordon (In re Gordon),* 277 B.R. 805, 810 (Bankr. M.D.Ga.2001) (Walker, J.) (citing *Jones,* 197 B.R. at 961). Within this analysis, the Court should not second guess the creditor's decision to extend credit, but neither should it allow the creditor to ignore readily available facts. *Id.* The totality of the circumstances may include, without limitation, the following factors: (1) whether the creditor followed its established lending procedure in renewing the floor-plan financing; (2) whether the creditor verified

the financial statements through outside sources; (3) whether the creditor had a previous relationship with the debtor; and (4) whether the financial statements contained any "red flags" that would have alerted the creditor to potential inaccuracies. *Id.*

First, the Court considers whether Citizens followed its established procedures. No evidence was presented as to procedures generally followed by the bank. However, Mr. Moye testified as to the procedures used with Milestone. When the time came for renewal, Citizens would contact Debtor and Tharpe, who would then bring in a financial statement that the bank would refer to in deciding whether to extend credit. According to the evidence, Citizens did not deviate from this procedure for the relevant renewals. Second, there is no evidence that Citizens looked to outside sources to verify the information in the financial statements.[4] Third, by the time Milestone sold collateral out of trust, it had established a relationship of approximately five years with Citizens. During that time, Milestone always paid its obligations to Citizens on time, including fully repaying the loans on 102 mobile homes. Fourth, the financial statements contained no information or "red flags" that would warn Citizens of their falsity. On the contrary, they were presented as having been prepared by a well-respected bookkeeping firm. Although the financial statements showed some reduction in net profit over the years, they reflected a stable or increasing net worth, so that the declining profits were not cause for alarm.

Based on the professional manner in which the financial statements were presented, the absence of "red flags" alerting of a possible falsity, Milestone's history with Citizens as a reliable customer, and Citizens' consistency in referring to the financial statements to make renewal decision, the Court finds that its reliance on the financing statements was reasonable.

 Finally, Citizens must prove Debtor's intent to deceive. "A bankruptcy court may look to the totality of the circumstances, including the recklessness of a debtor's behavior, to infer whether a debtor submitted a statement with intent to deceive." *Miller,* 39 F.3d at 305. "The failure to inform Plaintiff after learning about the inaccurate information indicates that Debtor intended the consequences that resulted.... [A] knowing renewal of a misrepresentation could lead to the conclusion that a debtor intended to deceive." *Gordon,* 277 B.R. at 812. Debtor in this case participated in developing the "estimates" used in the financial statements and then delivered those estimates to Wiles Bookkeeping. After Wiles typed up the estimates as financial statements, Debtor presented them to Citizens as a factual picture of Milestone's financial situation. He knew that the purpose of submitting financial statements was to obtain renewal of floor-plan financing. Nevertheless, Debtor has argued that his knowledge of Milestone's financial picture was limited to information provided to him by Tharpe. Even if that assertion were true, this Court would find Debtor's ignorance sufficiently reckless to satisfy the intent

---

**4.** As this Court has noted previously, a creditor is not always obligated to verify the information in a financial statement. *Jones,* 197 B.R. at 961. It may be necessary, for example, when " 'the creditor is aware of the debtor's reputation for untruthfulness or propensity to deceive.' " *Id.* (quoting *Banner Oil Co. v. Bryson (In re Bryson),* 187 B.R. 939, 963

(Bankr.N.D.Ill.1995)). In the present case, Debtor's reputation with the creditor was based in part on Milestone's timely payment of all previous obligations owed to the bank. Thus, ordinary prudence would not necessarily require independent verification of the financial statements.

requirement. The claim of ignorance is unpersuasive because, if true, it was by Debtor's own design. For an officer, director, and fifty percent shareholder to remain willfully ignorant of his company's finances is nothing more than a calculated attempt to absolve himself from the responsibilities of his position. The Court finds that, at a minimum, Debtor knew the information on the financial statements was based on estimates, not actual data. By presenting those statements to Citizens, Debtor acted with reckless disregard for the truth of the information contained within them. That recklessness, coupled with Debtor's willful ignorance as to the company's financial situation, is sufficient to prove that Debtor published the financial statements with an intent to deceive Citizens.

Citizens has proved all the elements of Section 523(a)(2)(B) with respect to the Milestone financial statements submitted for the years 1995 to 1999 and used by Citizens in the decision to renew financing from 1997 through 2000. Thus, the Court concludes that Debtor may not discharge his liability to Citizens for the ten mobile homes sold out of trust.

*Section 523(a)(6)*

■■■ Under Section 523(a)(6), debts arising from a willful and malicious injury inflicted by the debtor are not dischargeable. An injury is willful when the debtor had specific intent to inflict the injury or the injury was substantially certain to result. *Ford Motor Credit Co. v. Moody (In re Moody)*, 277 B.R. 865, 870 (Bankr. S.D.Ga.2001) (Walker, J.); *see also Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998). Injuries inflicted negligently or recklessly are excluded from the definition of "willful." *Geiger*, 523 U.S. at 64, 118 S.Ct. at 978. To be malicious, the injury must be

"wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." *Walker*, 48 F.3d at 1164 (citations and internal quotation marks omitted). "Malice may be implied or constructive.... In other words, 'a showing of specific intent to harm another is not necessary.'" *Id.* (quoting *Lee v. Ikner (In re Ikner)*, 883 F.2d 986, 991 (11th Cir.1989)). An officer or majority shareholder of a corporation may be liable in his individual bankruptcy for a willful and malicious injury inflicted by the corporation if he actively participated in the infliction of that injury. *Ford Motor Credit Co. v. Owens*, 807 F.2d 1556, 1559–60 (11th Cir.1987).

■■■ Depending on the circumstances and the course of dealings between the parties, a conversion of collateral or proceeds of collateral may be willful and malicious. *Wolfson v. Equine Capital Corp. (In re Wolfson)*, 56 F.3d 52, 54 (11th Cir. 1995). Among the circumstances courts consider with respect to whether a conversion is willful and malicious is whether the agreement between the parties required that the proceeds be held in trust for the creditor or be applied to the outstanding debt. *See Rentrak Corp. v. Cady (In re Cady)*, 195 B.R. 960, 967–68 (Bankr. S.D.Ga.1996) (Walker, J.). Another relevant factor is whether the creditor took reasonable steps to protect its collateral. *Bennett v. Wright (In re Wright)*, 282 B.R. 510, 518 (Bankr.M.D.Ga.2002) (Walker, J.) (citing *Wolfson*, 56 F.3d at 55).

In *Owens*, the debtor, who was an officer, a director, and the majority shareholder of a corporation in the business of retail auto sales, could not discharge a debt resulting from the out-of-trust sale of certain vehicles. 807 F.2d at 1560. When the corporation disposed of the proceeds, "it did not have any good faith reason for doing so and ... it presumptively knew

that harm would result from conversion of a secured party's collateral." *Id.* at 1559. However, in that case, the "floor plan agreement specified that [the dealership] had a duty to hold in trust all proceeds of any sale or other disposition of all merchandise subject to [the creditor's] purchase money security interest and to remit such proceeds promptly to [the creditor]." *Id.*

In cases in which the debtor was under no similar obligation with respect to the proceeds, courts have found a lack of willful and malicious injury. For example, the debtors in *Wright* and *Cady* were under no obligation by their creditors to hold or use the proceeds from the sale of collateral for a particular purpose. 282 B.R. at 518; 195 B.R. at 967–68. In both cases, as in *Wolfson,* the debtors placed the funds in their general operating accounts and used the funds to pay ordinary business expenses in an effort to keep their businesses afloat. 56 F.3d at 53; 282 B.R. at 514; 195 B.R. at 968. In each case, the court found Section 523(a)(6) to be inapplicable.[5] By contrast, in *Hoc. Inc. v. McAllister (In re McAllister),* 211 B.R. 976 (Bankr.N.D.Ala.1997), the court found malice in a conversion case in part because the debtor "did not use the proceeds from the sale of the cars in an effort to save [the company]." *Id.* at 983.

■ Collectively, the above cases indicate that Section 523(a)(6) is not intended to be a source of commercial recourse in ordinary debtor-creditor disputes. Although in this case, Debtor and Tharpe concealed the out-of-trust sales of Citizens' collateral, that concealment is not sufficient to prove a willful and malicious injury. First, they were under no specific obligation with respect to the proceeds. Second, Milestone was current on its obligations to Citizens at the time the bank discovered the out-of-trust position. This continued payment of accruing interest cuts against a finding that Milestone intended to harm Citizens or that its actions were malicious. Finally, Citizens' failed to follow through on the procedures it established to monitor its collateral. However, in this case, Citizens was unaware that Milestone was disposing with the proceeds of the sale of collateral, so Citizens' failure to act cannot serve to mitigate Milestone's actions. Although Citizens has shown some evidence supporting a finding of willful and malicious injury, the preponderance of the evidence favors Debtor. Thus, Citizens has failed to prove its case under Section 523(a)(6).

### Conclusion

Citizens has failed to meet its burden of proof under Sections 523(a)(2)(A) and (a)(6). With respect to (a)(2)(A), Citizens was unable to show a false representation by Debtor or its own reasonable reliance. With respect to (a)(6), Citizens was unable to demonstrate either willful or malicious infliction of injury. However, the bank has proven all the elements of Section 523(a)(2)(B) with respect to each mobile home sold out of trust. Therefore, the Court will enter judgment for Citizens Bank.

An Order in accordance with this Opinion will be entered on this date.

---

5. In each of these cases, the creditor knew or should have known about the alleged conversion but failed to take reasonable steps to protect its collateral. 56 F.3d at 53; 282 B.R. at 518; 195 B.R. at 968.